**KEMP INDUSTRIES, INC. and Apollo Associates, Ltd., Plaintiffs,**

v.

**SAFETY LIGHT CORP., USR Industries, Inc., USR Chemicals, Inc., USR Lighting, Inc., USR Metals, Inc., U.S. Natural Resources, Inc., The Prudential Insurance Company of America and John Does I–X, Defendants.**

Civ. A. No. 92–95 (AJL).

United States District Court,
D. New Jersey.

June 28, 1994.

374

Bruce D. Nimensky, Berger & Bornstein, P.A., Morristown, NJ, for plaintiffs.

Samuel P. Moulthrop, Laura M. Massaia, Riker, Danzig, Scherer, Hyland & Perretti, Morristown, NJ, for defendant The Prudential Ins. Co. of America.

## OPINION

LECHNER, District Judge.

This is an action by Kemp Industries ("Kemp") and Apollo Associates, Ltd. ("Apollo") (collectively the "Plaintiffs") against Safety Light Corporation ("Safety Light"), USR Industries, Inc. ("USR Industries"), USR Chemicals, Inc. ("USR Chemicals"), USR Lighting, Inc. ("USR Lighting"), USR Metals, Inc., ("USR Metals"), U.S. Natural Resources, Inc. ("USNR") and The Prudential Insurance Company of America ("Prudential") (collectively the "Defendants") for declaratory, injunctive and monetary relief under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601 *et seq.*, and the New Jersey Spill Compensation and Control Act (the "Spill Act"), N.J.S.A. §§ 58:10–23.11 *et seq.*

On 21–22 March 1994, a bench trial was held to resolve the preliminary issue of whether Prudential is a responsible party under either CERCLA or the Spill Act.[1]

---

1. Plaintiffs' trial submissions included: a trial brief, dated 14 March 1994 (the "Plaintiffs' Trial Brief"); a final pretrial statement, undated, re- ceived 14 March 1994 (the "Plaintiffs' FPS"); a written summation, dated 22 April 1994 (the "Plaintiffs' Summation"); and proposed findings

For the reasons stated below, Prudential is found not to be a responsible party under either CERCLA or the Spill Act.

### Procedural History

On 15 January 1992, Plaintiffs filed a seven-count complaint (the "Complaint") against Safety Light demanding that Safety Light be compelled to "commence removal and remedial action" with respect to environmental hazards on Plaintiffs' property, as well as other declaratory and monetary relief. The Complaint alleged that Safety Light's predecessor-in-interest, United States Radium ("USR"), "utilized unsafe and improper methods to dispose of large quantities of liquid and solid waste." Complaint, ¶ 10.

Count one of the Complaint ("Count I") alleged that these illegal acts entitled Plaintiffs to declaratory, injunctive and monetary relief under CERCLA. *Id.*, ¶¶ 16–27. Count two of the Complaint ("Count II") sought relief under the Spill Act. *Id.*, ¶¶ 28–36. Count three ("Count III") sought recovery under Federal common law. *Id.*, ¶¶ 37–42. Count four ("Count IV") sought to hold Safety Light strictly liable for the damages and cleanup costs and responsibilities associated with Plaintiffs' property. *Id.*, ¶¶ 43–50. Count five ("Count V") sought recovery on the theory of negligence. *Id.*, ¶¶ 51–54. Count six ("Count VI") sought recovery on the theory of nuisance. *Id.*, ¶¶ 55–65. Finally, count seven ("Count VII") sought recovery on the basis of alleged fraud and deceit on the part of Safety Light. *Id.*, ¶¶ 67–70.

On 26 August 1992, Plaintiffs amended the Complaint to include Prudential as a defendant (the "Amended Complaint"). The Amended Complaint was in all other respects substantially identical to the Complaint. On 1 June 1993, Plaintiffs filed a second amendment (the "Second Amended Complaint"), adding USR subsidiaries USR Industries, USR Chemicals, USR Lighting, USR Metals and USNR as defendants. In all other respects, the Second Amended Complaint is substantially identical to the Complaint and the Amended Complaint.

In December 1993, Prudential moved for summary judgment on Counts II, III, IV, V and VI of the Second Amended Complaint. By opinion and order, dated 25 January 1994, Prudential was granted summary judgment on Counts III, IV, V and VI on the ground that these counts were time-barred as to Prudential. *See Kemp Industries, Inc. v. Safety Light Corp.,* 1994 WL 532130 (D.N.J. 25 Jan. 1994). Prudential was also granted summary judgment on part of Count II. *Id.* As a result, only Count I, Plaintiffs' CERCLA claim, a portion of Count II, Plaintiffs' Spill Act claim, and Count VII, Plaintiff's claim for fraud and deceit, remain in the Second Amended Complaint.

At a status conference, held 7 March 1994, Prudential contended that a substantial issue existed as to whether Prudential could be deemed a responsible party under either CERCLA or the Spill Act. Accordingly, a bench trial was commenced on 21 March 1994 to determine this preliminary issue.

### Findings of Fact [2]

1. Kemp is a corporation organized and existing under the laws of the state of Dela-

---

of fact and conclusions of law, dated 22 April 1994 (the "Plaintiffs' Proposed Findings").

Prudential's trial submissions included: a trial brief, dated 14 March 1994 (the "Prudential Trial Brief"); a supplement to the Prudential Trial Brief, dated 22 April 1994 (the "Prudential Trial Supp."); a final pretrial statement, dated 13 March 1994 (the "Prudential FPS"); a written summation, dated 22 April 1994 (the "Prudential Summation"); and proposed findings of fact and conclusions of law, dated 22 April 1994 (the "Prudential Proposed Findings").

The parties jointly submitted a stipulation of facts (the "Stipulation") and a joint document list (the "Document List").

Citations to the transcript of the trial will be as: "Tr. at ——."

**2.** The Findings of Fact contain a number of factual findings which have been made upon completion of the bench trial. There was ample opportunity to examine the submissions of the parties and determine the credibility of the several witnesses after observing their demeanor and considering their relative interest, if any, in this matter. Many of the Findings of Fact are substantiated with citations to testimony or documentary evidence or a combination thereof; such citations are not meant to be exhaustive authority for the finding. Some of the findings are based upon the record or inferences from the record which are not cited.

This opinion, including the legal discussion, constitutes the Findings of Fact and Conclusions of Law pursuant to Fed.R.Civ.P. 52(a). All pro-

ware and has a place of business in West Milford, New Jersey. *See* Second Amended Complaint, ¶ 4. Kemp is currently owner of the land and premises designated as lots 12 ("Lot 12") and 13 ("Lot 13") in Block 3901 on the tax map of the Township of Hanover, Morris County, New Jersey (collectively, the "Hanover Site"). *Id.*

2. Apollo is a limited partnership organized and existing under the laws of the state of New Jersey and has a place of business in Morristown, New Jersey. *See id.*, ¶ 6. Apollo is the owner of lands adjacent to the Hanover Site. *Id.*, ¶ 8. Apollo is also prospective purchaser of the Hanover Site. *Id.*, ¶ 6.

3. USR was a corporation existing under the laws of Delaware, engaged in, among other things, the production of phosphors. *See* Stipulation, ¶¶ 16–17. In or about 1980, USR underwent corporate restructuring. As a result of the reorganization, USR formed Safety Light, USR Industries, USR Chemicals, USR Lighting, USR Metals and USNR. *See* Second Amended Complaint, ¶ 8A. Before 21 December 1950, USR owned Lot 13.

4. Prudential is a mutual insurance company organized and existing under the laws of New Jersey. *See* Stipulation, ¶ 1. Prudential held title to Lot 13 from 21 December 1950 until 24 July 1964. *See* Stipulation, ¶ 27; Exs. J–16, J–17.

5. During World War II, Prudential invested its assets primarily in war bonds. *See* Stipulation, ¶ 2. Following the War, in or about 1946, Prudential began to transfer assets from war bonds into other investments. *Id.*, ¶ 3.

6. At this time, income tax rates were high and there was a great deal of uncertainty as to the future of the United States economy. *Id.*, ¶ 3; Tr. at 76. Interest rates and inflation were minimal. *See* Tr. at 76. This economic climate led to a conservative attitude toward investments. *Id.* at 77.

*The Property Purchase Program*

7. In this economic climate, Prudential embarked on a plan to redistribute its assets so as to guarantee a fixed but steady return on its investments. *See* Stipulation, ¶ 8. Accordingly, in or about 1946, Prudential adopted "a modest program for the purchase of carefully selected income properties and also the purchase of some unimproved property for development...." *Id.*, ¶ 9. This program was referred to as the "Industrial Loan and Property Purchase Program" (the "Program"). Tr. at 74.

8. Pursuant to the Program, Prudential's Mortgage Loan Department was expanded to provide financing for one-story industrial properties. *Id.* The financing method utilized by the Program was the 'sale-lease-back.' *Id.* at 79.

9. The sale-leaseback emerged as a financing method in the late 1940s. *Id.* at 122. It is neither a loan nor a sale, but rather a "hybrid financing device" whereby the debtor 'sells' property to the creditor in exchange for the amount the debtor requires to acquire the property, and the creditor simultaneously leases the property to the debtor for the debtor's continued use. *Id.* at 122, 126. "Under this arrangement, the seller receives cash from the transaction and the buyer is assured a tenant and a fixed return on the investment." *The Dictionary of Real Estate Appraisal* 318 (3d ed. 1993).

10. In a sale-leaseback, the buyer/creditor takes title to the subject property,[3] but the seller/debtor retains the primary benefits of ownership, such as "long-term occupancy and control over the property." Tr. at 122. The benefits of such an arrangement to the debtor are that there is little or no capital investment required and the debtor may obtain financing closer to the value of the collateral—the leased property—than in a conventional loan. *Id.* For example, whereas a lender may not feel comfortable loaning a mortgagor more than 75% of the value of the

posed findings of fact and conclusions of law inconsistent with those set forth herein are rejected.

**3.** Prudential typically took "fee simple title" to properties involved in the Program. Tr. at 110.

Upon instituting the Program, Prudential informed its investors it had entered the field of "equity ownership." Prudential Mortgage Loan and Real Estate Investment Department Review of Activities for the Year 1950 (the "1950 Review"), submitted into evidence as Ex. J–34, at 4.

mortgaged property, the buyer in a sale-leaseback generally provides financing in an amount up to 100% of the value of the subject property. *See* Tr. at 129; *Ellwood Tables for Real Estate Appraising and Financing* (the "*Ellwood Tables*") 115 (2d ed. 1967) ("Despite its all cash nature, the philosophy and economics of purchase-leaseback are little different than those of the level periodic installment, full-amortization mortgage investment. Imagine if you will this type of mortgage investment at 100% of purchase price and you have the most important, initial characteristic of the typical purchase-leaseback transaction."). Prudential's industrial mortgage loans typically provided the mortgagor with only two-thirds of the value of the mortgaged property. Tr. at 74.

11. Because of the increased risk posed by the sale-leaseback configuration, Prudential expected to obtain a return of ½% to ¾% more from such transactions than it could obtain in a conventional mortgage loan. Tr. at 82. In 1950, the average yield on mortgage loans made by Prudential's Mortgage Loan Department in New Jersey was 4.07%. *See* 1950 Review at 9.

12. "Typical buyers [in sale-leasebacks] are life insurance companies and pension trusts [which] are interested primarily in long-term income at a fixed rate of return commensurate with that obtainable from well secured mortgage investments." *Ellwood Tables* 116; Tr. at 130. "Institutional buyers normally are not in [a] position to, or at least do not wish to provide real estate management. Consequently, the leases are usually written on an absolutely net basis with the tenant providing all the management and paying all the bills." *Ellwood Tables* 116.

13. In instituting the Program, Prudential was interested not in owning or operating industrial properties, but in obtaining a fixed rate of return on its investments. *See* Tr. at 86–87. Accordingly, Prudential, after obtaining the deeds to properties acquired in the Program, "had very little involvement with these properties, other than to do periodic ride-by inspections to determine if the prop-

erties were being maintained satisfactorily."[4] *Id.* at 86. Prudential did not supervise the management of any of these properties. *Id.* at 86–87.

14. In evaluating a proposed sale-leaseback, the primary consideration to the financing institution is generally the creditworthiness of the 'seller':

> Although type, quality and condition of the real estate are afforded due consideration, the financial responsibility of the tenant and his prospects for continued success for a long period of future years are of great importance. He will be subjected to the same investigation and be expected to meet the same qualifications as if he were applying for long-term debenture financing.

*Ellwood Tables* 116.

15. Prudential evaluated prospective participants in the Program in similar fashion. There were two key criteria in evaluating applicants: the creditworthiness of the applicant and the value of the property as security.[5] Tr. at 75–76. An industrial company that approached Prudential seeking financing through the Program was required to provide Prudential with operating statements and other credit history over the previous ten years. *Id.* at 78–79. Prudential would then appraise the subject property "to establish the security [it was] getting for the financing [it was] extending." *Id.* at 79–80. "Only companies on which Prudential could qualify their credit" were accepted into the Program. *Id.* at 74.

16. As title owner of the properties in the Program, Prudential was entitled to, and typically did, take a depreciation on the properties for tax purposes, in accordance with Internal Revenue Service ("IRS") regulations. *Id.* at 74; *see* Deposition of Russell Apgar (the "Apgar Dep."), submitted into evidence as Ex. P–42, at 48.

17. In 1950, Prudential typically did not grant repurchase options to participants in the Program. Tr. at 109. Prudential "made

---

4. Prudential performed the same type of inspections with respect to mortgaged properties. Tr. at 86.

5. These same criteria were applied by Prudential to applications for mortgage loans. Tr. at 76.

the assumption that [the subject properties] wouldn't be worth anything [upon the expiration of the lease] because [it] had very little experience with these properties and the primary purpose was to get [its] money back." *Id.* at 90.

18. This policy, moreover, was intended to preserve certain tax benefits to sellers. *Id.* Specifically, in 1950, rental payments made by the seller/tenant in a sale-leaseback would be fully deductible under Federal tax laws. *Id.* at 143–44. The inclusion of a repurchase option in a sale-leaseback would have caused the IRS to view the transaction as a conditional sale and refuse these tax benefits to sellers. *Id.*

### The USR Leaseback

19. In the late 1940s, USR decided to construct a facility on Lot 13 to accommodate anticipated expansion of its phosphor production operations. *See* Stipulation, ¶¶ 18–19. USR's vice president located Lot 13 and recommended it to USR as an appropriate site for expansion. *Id.,* ¶ 20. USR required financing for the project and approached Prudential to secure such financing. USR also proposed to construct, according to its own specifications, a building on Lot 13 (the "USR Building"). *See* Deposition of John Davenport (the "Davenport Dep."), submitted into evidence as Ex. D–20, at 8–9.

20. Prudential evaluated USR's proposal as it did any other proposal from an applicant to the Program. Tr. at 85. In an internal memorandum to Prudential's Finance Committee, dated 2 May 1950 (the 2 May 1950 Memo"), the Mortgage Loan Department recommended acceptance of USR's proposal. *See* 2 May 1950 Memo, submitted into evidence as Ex. J–3, at 1. The 2 May 1950 Memo recommended that Prudential purchase Lot 13 from USR for a price not to exceed $179,000, an amount representing 95.5% of the appraised value of Lot 13 and the proposed USR Building.[6] *Id.* (stating appraised value of Lot 13 and USR Building was $197,000); *see* Tr. at 135.

21. The 2 May 1950 Memo recommended an initial lease term of twenty-five years, with four ten-year renewal options. *See* 2 May 1950 Memo at 1. The Mortgage Loan Department recommended a net annual rent of $15,322.40, representing 8.56% of the purchase price, for the first fifteen years of the initial term and $4,528.70, representing 2.53% of the purchase price, for the remaining ten years of the initial term. *Id.* The recommended annual rent for the first two renewal terms was $4,475.00, representing 2.5% of the purchase price. The recommended annual rent for the final two renewal terms was $3,580.00, representing 2.0% of the purchase price. *Id.*

22. Based on these rents, the 2 May 1950 Memo stated the USR Building "will be amortized in approx[imately] 14⅔ years and the land and building in approx[imately] 15 years at 3½ int[erest]." *Id.* The 2 May 1950 Memo further predicted the "[y]ield with complete recovery of investment over 25 years will be 5%." *Id.*

23. The terms "amortize" and "interest" are most commonly used in connection with security transactions and not in connection with purchases of property for the purpose of ownership. *See* Tr. at 184.

24. The 2 May 1950 Memo recommended that USR be obligated "to pay all taxes, assessments, water charges, insurance and utilities" and that USR be further required to submit audited financial statements "annually within 90 days after the end of each fiscal year." 2 May 1950 Memo at 2. The 2 May 1950 Memo concluded:

> [USR] agrees if the total cost of the proposed project exceeds the sum of $197,-000 by not more than 10%, it shall pay such excess out of its corporate funds. However, if said costs shall be exceeded by more than 10%, [Prudential] may at its option cancel any commitment issued by it unless such funds over said 10% are provided for by new capital or from net earn-

**6.** The appraised value of the USR Building was $192,000; the appraised value of Lot 13 was $5,000. *See* 2 May 1950 Memo at 1.

ings of [USR] transferred to surplus, subsequent to January 1, 1950.

*Id.*

25. The 2 May 1950 Memo demonstrates that Prudential viewed the proposed transaction with USR primarily as a financing and not as a purchase of property. Tr. at 183. Prudential viewed its interest in Lot 13 as a guarantee of USR's obligations and returns on the proposed transaction as interest on its initial commitment. *Id.* at 184–85. This finding is further supported by Prudential's interest in the creditworthiness of USR and the cost to USR of the proposed USR Building. *Id.* at 184.

26. On 10 July 1950, USR and Prudential entered into an agreement (the "Leaseback Contract") whereby Prudential would acquire title to Lot 13 from USR for a price of $179,000.00 and simultaneously lease the property back to USR. Stipulation, ¶¶ 24–26; *see* Leaseback Contract, submitted into evidence as Ex. J–5.

27. After execution of the Leaseback Contract, USR hired Wm. Blanchard Co. (the "Contractor") to construct a production facility, the USR Building, on Lot 13. Davenport Dep. at 8. Construction was completed in December 1950, at a total cost of $187,670.19. *See* Sworn Statement of Cost, dated 21 December 1950 (the "Cost Statement"), submitted into evidence as Ex. J–11. Of this total cost, $3,500.00 represented the cost to USR of acquiring Lot 13 itself. *Id.*

28. On 21 December 1950, USR conveyed title to Lot 13 and the USR Building to Prudential through transfer a deed, dated 21 December 1950 (the "1950 Deed"). *See* Stipulation, ¶¶ 27, 29; 1950 Deed, submitted into evidence as Ex. J–6, at 1. The 1950 Deed is marked with $196.90 in revenue stamps. *Id.* Simultaneous with delivery of the 1950 Deed, Prudential and USR entered into the lease contemplated by the Leaseback Contract (the "Lease"). Stipulation, ¶ 28.

29. Pursuant to the Lease, USR, along with its "successors and assigns" were conveyed the right "to have and to hold" Lot 13 for an initial term of twenty-five years at a net annual rental of $15,322.40 until 1 December 1965 and $4,528.70 thereafter.

Lease, submitted into evidence as Exhibit J–7, at 2.

30. The rental payments under the Lease were structured so as to amortize the amount committed by Prudential in the Leaseback Contract over the useful life of the property. *Id.* at 88–89, 140. Such a structuring of rental payments is consistent with the treatment of mortgage loans. *Id.*

31. Also pursuant to the Lease, USR agreed to pay

all real estate taxes, assessments, water rates and charges, and other governmental charges, general and special, ordinary and extraordinary, unforeseen as well as foreseen, of any kind and nature whatsoever, including but not limited to assessments for public improvements or benefits which shall during the term hereby demised be laid, assessed, levied, or imposed upon or become due and payable and a lien upon the demised premises or upon any part thereof. . . .

Lease, Art. III, § 1. Rent under the Lease could not be offset by any such payments, "it being the intention of the parties [to the Lease] that the basic rent . . . shall be paid to [Prudential] absolutely net without deduction of any nature whatsoever except as in th[e] Lease. . . ." *Id.*, Art. III, § 2.

32. The Lease provided USR with "the right to contest the amount or validity of any such imposition [of taxes or governmental assessments] by appropriate legal proceeding. . . ." *Id.*, Art. III, § 5. Prudential was not required to join any such proceeding "unless it shall be necessary for it to do so in order to properly prosecute such proceeding and [Prudential] shall have been fully indemnified to its satisfaction against all costs and expenses in connection therewith. . . ." *Id.*, Art. III, § 6.

33. Under the Lease, USR was required, at its "sole cost and expense, [to] keep all buildings erected upon [Lot 13] and the fixtures therein, insured . . . in an amount which shall be sufficient to prevent [Prudential or USR] from becoming a co-insurer of any loss. . . ." *Id.*, Art. IV, § 1. Pursuant to this requirement, USR was responsible for obtaining insurance against

loss or damage by fire and ... against such other risks, of a similar or dissimilar nature, as are or shall be customarily covered with respect to buildings similar in construction, general location, use and occupancy to the [USR Building], including, but without limiting the generality of the foregoing, windstorm, hail, explosion, riot and civil commotion, damage from aircraft and vehicles and smoke damage, as and when insurance against such other risks is obtainable.

*Id.*

34. USR was further required, at its sole cost and expense, to maintain "general public utility insurance against claims for personal injury, death or property damage occurring on or about [Lot 13] ...; steam boiler insurance on all steam boilers, pressure boilers or other such apparatus ...; and ... war damage insurance...." *Id.*, Art. IV, § 2. All insurance policies obtained by USR pursuant to the provisions of the Lease were to be payable to USR and Prudential "as their respective interests may appear." *Id.*, Art. IV, § 3. Premiums from insurance policies in force at the termination of the Lease were to be apportioned between Prudential and USR. *Id.*, Art. IV, § 6.

35. Under the Lease, USR was required to submit to Prudential, no later than 120 days after the end of each fiscal year, "profit and loss and income statements of [USR] for such year and a balance sheet ... certified by independent certified public accountants of recognized standing selected by [USR] and satisfactory to [Prudential]." *Id.*, Art. XXIV. USR was also obligated to provide Prudential with "copies of all such financial statements, reports and returns as it shall send to its stockholders." *Id.*

36. USR was further required, at its sole expense, "to take good care of [Lot 13 and the USR Building] ... and to keep the same in good order and condition." *Id.*, Art. VI. The Lease also provided USR was to "promptly at [its own] cost and expense make all necessary repairs, interior and exterior, structural, ordinary as well as extraordinary, foreseen as well as unforeseen." *Id.* USR was further required to "keep and maintain all portions of [Lot 13] and the sidewalks adjoining same in a clean and orderly condition, free of accumulation of dirt, rubbish, snow and ice." [7] *Id.*

37. By the Lease, USR also covenanted to perform all "structural repairs and alterations" necessary to "comply with all laws and ordinances and the orders, rules, regulations and requirements of all [F]ederal, state and municipal governments and appropriate departments, commissions, boards and officers thereof...." *Id.*, Article VII, § 1. All such structural alterations were subject to prior approval by Prudential and a surety bond was to be posted in Prudential's favor for alterations whose cost exceeded $15,000.00. *Id.*, Art. VIII.

38. Subject to these and certain other restrictions, [8] USR had the right, at any time, "to make such changes and alterations, structural or otherwise, to the [USR Building and Lot 13] as [USR] shall deem necessary or desirable in connection with the requirements of its business...." *Id.*

39. The right of Prudential to approve major structural changes made by USR is consistent with the rights of a mortgagee in a traditional mortgage loan agreement. Tr. at 96.

---

7. USR was required, in the event of an excavation or construction on adjacent land, to "shore the foundations of [Lot 13] and do any other act or thing necessary for the safety of [Lot 13]." Lease, Art. XIII. USR was also required, at its sole cost and expense, to repair or restore any fixture or building on Lot 13 damaged or destroyed "by fire or otherwise." *Id.*, Art. XVI. USR was obligated, upon termination of the Lease for any reason, to surrender Lot 13 to Prudential "in good order, condition and repair except for wear and tear." *Id.*, Art. XXIV.

8. These other restrictions included: all changes involving a cost of over $15,000 were to be conducted under the supervision of an architect or engineer and performed by a builder or contractor, "each of whom shall be reasonably satisfactory to [Prudential];" all alterations were to "be of such a character as not to reduce, or otherwise adversely affect, the value of [Lot 13], nor to reduce the cubic content of the [USR Building], nor change the character of the [USR Building] as to use;" and all improvements and alterations made by USR were, upon expiration or termination of the Lease, to become the property of Prudential. Lease, Art. VIII.

40. Under the Lease, Prudential was authorized to "enter [Lot 13] at all times during usual business hours for the purpose of inspecting the same and making any necessary repairs ... and performing any work therein that may be necessary to comply with any laws, ordinances, rules, regulations or requirements of any public authority...." Lease, Art. XI, § 1. This authorization, however, did not imply any duty to inspect or to perform repairs or alterations for which USR was responsible under the Lease. *Id.*

41. During the entire term of the Lease, Prudential was authorized to enter Lot 13 during business hours and "to exhibit the same for the purposes of sale or hire...." *Id.*, Art. XI, § 2. During the final eleven months of the final renewal term of the Lease, Prudential was "entitled to display on [Lot 13] in such manner as not [to] unreasonably interfere with [USR's] business the usual 'For Sale' or 'To Let' signs...." *Id.*

42. Pursuant to the Lease, USR had the right to "assign or transfer" its rights under the Lease or "sublease the whole or any part of [Lot 13]" without consent of Prudential, provided that USR remain ultimately liable to Prudential for its obligations under the Lease. *Id.*, Art. XII. If USR had exercised its rights under this provision, it would have reaped the benefit of any appreciation in the value of Lot 13. Tr. at 143.

43. USR agreed to pay "all charges for gas, electricity, light, heat or power, telephone or other communication serviced used" on Lot 13. Lease, Art. XIV. In connection with this obligation, it was USR's responsibility to "procure [and pay for] any and all necessary permits, licenses or other authorizations required for the lawful and proper installation and maintenance upon [Lot 13] of wires, pipes, conduits, tubes and other equipment and appliances for use in supplying any such service to and upon [Lot 13]." *Id.*

44. Under the Lease, USR agreed to "indemnify and hold harmless" Prudential against all claims "arising from the conduct or management of or from any work or thing whatsoever done in or about the demised premises." *Id.*, Art. XV, § 1. In addition, USR agreed to indemnify Prudential against all claims arising from the condition of adjoining property as a result of USR's conduct on Lot 13. *Id.*

45. In the event that all of Lot 13 were taken as eminent domain, the Lease would expire and "all right, title and interest of [USR]" thereunder would cease. *Id.*, Art. XVII, § 1. In such event, Prudential would be entitled to the entire award in the eminent domain proceeding. *Id.* If less than all but more than 20% of Lot 13 were taken as eminent domain, USR had the right to terminate the Lease. *Id.*, Art. XVII, § 2. In such event, Prudential would still be entitled to the entire award from the eminent domain proceeding. *Id.* If less than 20% of Lot 13 were taken in an eminent domain proceeding, USR would not have the right to terminate the Lease, but Prudential would be obligated to apply the amount of any eminent domain award to the cost of restoring that portion of the USR Building which was damaged as a result of the eminent domain taking. *Id.*, Art. XVII, § 3.

46. The eminent domain provisions of the Lease were consistent with the conservatism of lenders in 1950 and do not make the Lease unconventional in the context of early leaseback transactions. Tr. at 115. In any event, condemnation was considered an unlikely prospect for industrial properties in 1950. *Id.*

47. If USR were to breach or default on its obligations under the Lease, Prudential would have the right to dispossess USR of Lot 13 and collect any unpaid rent to the end of the current term of the Lease, "less the net avails of reletting, if any." Lease, Art. XX, § 3.

48. Under the Lease, USR would have the right to extend the term of the Lease for four successive periods of ten years each. *Id.*, Art. XX, § 1. The rent for the first two such renewal terms was set at $4,475.00 per year. *Id.* The rent for the remaining renewal terms was $3,580.00 per year. *Id.* The rent payments for these renewal terms were nominal.[9] Tr. at 140. The stepped-

9. Even if USR had exercised all of its renewal options under the Lease, the net yield to Pruden-

down rent schedule provided in the Lease rendered the value of Prudential's reversionary interest insignificant. *Id.*

49. The Lease did not contain a repurchase option. Sale-leasebacks executed in the 1950s typically did not contain such an option. *Id.* at 143. At that time, a repurchase provision was not deemed significant by parties in a sale-leaseback. *Id.* at 185; *see Ellwood Tables* at 117 ("[T]he influence of the reversion on yield was not given much thought in the early years of institutional investment . . . .").

50. In 1950, there was no expectation of residual value in industrial property. Tr. at 134. As indicated, the inflationary rate was close to zero and there was little probability that industrial property would appreciate in value. *Id.* Accordingly, Prudential and USR expected that the value of the USR Building and Lot 13 at the end of the renewal terms would be insignificant. *Id.* at 138–39 (value of Lot 13 at end of renewal period would be $146.81; value of USR Building would be zero); *see id.* at 90.

51. In 1950, the useful life of Lot 13 and the USR building was projected as thirty-five to forty years. *Id.* at 137. The economic life of the structure was approximately twenty-five years. *Id.* As indicated, USR had the right, under the renewal provisions in the Lease, to occupy Lot 13 for up to sixty-five years. *See* Lease, Art. XX, § 1. Thus, USR was granted exclusive use of the property for a period longer than its useful or economic life. Tr. at 183.

52. Because the length of USR's occupancy under the Lease exceeded the life of the property for economic purposes, there was no reason for USR to seek a repurchase option. *Id.* at 185; *cf. Ellwood Tables* at 115 ("When the lease with options for extension exceeds 40 years [a repurchase option] will make very little difference except in the event of excessive inflation.").

53. USR, moreover, had reason to seek exclusion of a repurchase option from the Lease. In 1950, rental payments made by the borrower/lessee in a sale-leaseback were fully deductible from the lessee's Federal income tax liability. Tr. at 143–44. The inclusion of a fixed-price repurchase option in a sale-leaseback would have caused the IRS to view the entire transaction as a conditional sale, thereby voiding these tax benefits. *Id.* In light of the slight residual value of Lot 13 and the USR Building, the aforementioned tax benefits were more valuable to USR than a repurchase option.

54. After executing the Lease,[10] Prudential obtained title insurance in relation to Lot 13 and the USR Building in the amount of $179,000.00. *See* Policy of Title Insurance (the "Title Policy"), submitted into evidence as Ex. J–9. In the Title Policy, Prudential's interest in Lot 13 was described as "[a]n estate in fee simple." *Id.,* Schedule A.

55. Over the next thirteen years, Prudential had little or no involvement with Lot 13 apart from its collection of rents under the Lease.[11] *See* Deposition of John W. Wilson (the "Wilson Dep."), submitted into evidence as Ex. D–14, at 17–18 (employee of USR testifying he did not recall having seen a Prudential employee at Lot 13); Deposition of Thomas V. Nairn (the "Nairn Dep."), submitted into evidence as Ex. D–17, at 12–13 (senior operator at Lot 13 testifying he never knew of Prudential participating in operation of Lot 13); Deposition of James T. Mattis (the "Mattis Dep."), submitted into evidence as Ex. D–18, at 13 ("I never really heard of any connection [of Lot 13] with Prudential."); Davenport Dep. at 11–12 (employee of USR stating he never saw an employee of Prudential at Lot 13). Prudential did not participate in the operation or management of Lot 13 in any respect. *Id.*

___

tial beyond its initial investment would have been 6%. Tr. at 185.

10. The leaseback transaction between USR and Prudential involving Lot 13 and the USR Building will be referred to as the "USR Leaseback."

11. As owner of Lot 13, Prudential took depreciation on the property for tax purposes. Tr. at 192–94. Prudential, as a mutual insurance company, was not required to pay the full tax rates on its investments. *Id.* at 60. The tax benefits provided to Prudential by its ownership of Lot 13, therefore, were of little significance to Prudential. *Id.* at 99.

56. On 24 July 1964, Prudential sold its entire interest in Lot 13 back to USR for a purchase price of $103,000.00. *See* Exs. J–16, J–17.

*Credibility and Persuasiveness of Experts*

57. The parties offered the testimony of experts in an effort to describe the nature of the transactions between USR and Prudential. Prudential offered the testimony of two experts, each of whom opined that Prudential took title to Lot 13 and the USR Building primarily to secure the credit extended to USR in the USR Leaseback. Plaintiffs offered the testimony of one expert, who stated Prudential took title to Lot 13 to gain the normal benefits of ownership. That portion of the testimony of these experts which was credited and relied upon by the court is incorporated into the Findings of Fact above.

58. The first of Prudential's experts was William N. Kinnard, Jr. ("Kinnard"). Kinnard has been a professor of finance for twenty-six years and has studied real estate finance as it existed in the late 1940s and 1950s. Tr. at 116–18. Kinnard began his career as a teacher of real estate finance in 1955. *Id.* at 117. Kinnard has had extensive experience studying and teaching about sale-leaseback transactions and has written two texts involving discussions of the sale-leaseback. *Id.* at 118–19.

59. In reaching his opinion that the 1950 Deed was taken by Prudential primarily to protect its security interest in Lot 13, Kinnard consulted several articles and publications which he and his associates had identified as "dealing with [the] sale-leaseback during periods of time reasonably close to the 1950 date of the [USR Leaseback]." *Id.* at 121.

60. Prudential also offered the testimony of Paul Rosenberg ("Rosenberg"), an attorney in the field of real estate financing. Rosenberg is a graduate of Harvard Law School and the New York University School of Law, and has been practicing for thirty years. *Id.* at 181. Rosenberg has had experience with approximately thirty sale-leaseback transactions during his career. *Id.* In determining the USR Leaseback was a security transaction, Rosenberg examined the provisions of the Lease and the objectives of both USR and Prudential in entering into the USR Leaseback. *Id.* at 183–85.

61. Unlike Prudential's experts, Plaintiffs' expert, Joel Rothenberg ("Rothenberg"), admitted he had no experience with sale-leasebacks as they existed in 1950, or sale-leasebacks used as a financing mechanism. *Id.* at 46, 49–50. For these reasons, and other reasons relating to Rothenberg's credibility, demeanor and persuasiveness, Rothenberg's testimony was credited to a far lesser degree than that of Prudential's experts.[12]

*Discussion*

A. *Status of Prudential under CERCLA*

As indicated, Count I of the Second Amended Complaint seeks recovery from Prudential under CERCLA. CERCLA was enacted to ensure that the extensive costs involved in the cleanup of environmental hazards were borne by the responsible parties and not by the taxpayers. *See* A Legislative History of CERCLA, Senate Committee of Environment and Public Works, S.Doc. No. 97–14, 97th Cong., 2d Sess.1983, Vol. I at 320 (One of CERCLA's principal goals is "assuring that those who caused chemical harm bear the costs of that harm...."). In accordance with this purpose, section 107 of CERCLA, 42 U.S.C. § 9607, imposes strict liability on a defendant "where the plaintiff establishes the following four elements:"

(1) the defendant falls within one of four categories of "responsible parties";

(2) the hazardous substances are disposed of at a "facility";

(3) there is a "release" or threatened release of hazardous substances from the facility into the environment;

(4) the release causes the incurrence of "response costs."

---

12. Plaintiffs also offered evidence regarding four other transactions involved in the Program. *See* Plaintiffs' Proposed Findings, ¶¶ 152–206. Because these transactions were separate and independent from the USR Leaseback, they were not considered relevant to the characterization of the latter. To the extent evidence regarding these other transactions was relevant in describing the Program as a whole, such evidence was cumulative and of slight probative value.

*United States v. Alcan Aluminum Corp.*, 964 F.2d 252, 258–59 (3d Cir.1992) (quoting 42 U.S.C. § 9607); *see Reading Co. v. City of Philadelphia*, 155 B.R. 890, 895 (E.D.Pa. 1993); *United States v. Serafini*, 750 F.Supp. 168, 170 (M.D.Pa.1990); *Artesian Water Co. v. Government of New Castle County*, 659 F.Supp. 1269, 1278 (D.Del.1987), *aff'd*, 851 F.2d 643 (3d Cir.1988).

"Responsible parties" are defined by section 107 as:

(1) the owner or operator of a vessel or facility,

(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,

(3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and

(4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance. . . .

42 U.S.C. § 9607(a); *see Alcan Aluminum Corp.*, 964 F.2d at 257 n. 4; *Reading Co.*, 155 B.R. at 895.

In the instant case, Plaintiffs seek to hold Prudential liable under section 107 as a person who "at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of." 42 U.S.C. § 9607(a)(2); *see* Plaintiffs' Trial Brief at 1. Prudential counters that it was never an "owner or operator" of Lot 13, as that term is defined by CERCLA, and that it cannot, therefore, be held liable for the response costs sought in the Second Amended Complaint.

The provision relied upon by Prudential is commonly known as the 'security interest exemption' to CERCLA's strict liability scheme. Pursuant to section 101 of CERCLA:

The term "owner or operator" . . . does not include a person, who, without participating in the management of a vessel or facility, holds indicia of ownership primarily to protect his [or her] security interest in the vessel or facility.

42 U.S.C. § 9601(20)(A). "The purpose of this exception, apparent from its language and the statutory context, is to shield from liability those 'owners' who are in essence lenders holding title to the property as security for the debt." *Waterville Industries, Inc. v. Finance Authority of Maine*, 984 F.2d 549, 552 (1st Cir.1993); *see Northeast Doran, Inc. v. Key Bank of Maine*, 15 F.3d 1, 2 (1st Cir.1994); *Snediker Developers Limited Partnership v. Evans*, 773 F.Supp. 984, 987 (E.D.Mich.1991). "Congress may have been concerned with maintaining sources of credit or may have thought that CERCLA's far-reaching liability should be limited to those owners who had the real equity interest in the property." *Waterville Industries*, 984 F.2d at 552.

The party seeking to invoke the security interest exemption has the burden of establishing its entitlement to the exemption. *See United States v. Fleet Factors Corp.*, 901 F.2d 1550, 1556 (11th Cir.1990), *cert. denied*, 498 U.S. 1046, 111 S.Ct. 752, 112 L.Ed.2d 772 (1991); *United States v. Maryland Bank & Trust Co.*, 632 F.Supp. 573, 578 (D.Md.1986); *see also United States v. First City National Bank of Houston*, 386 U.S. 361, 366, 87 S.Ct. 1088, 1092, 18 L.Ed.2d 151 (1967) ("That is the general rule where one claims the benefits of an exception to the prohibition of a statute."). To sustain this burden, the party must prove "both that [it] holds indicia of ownership primarily to protect its security interest in the [subject property] and that it did not participate in the management of the [property]." *In re Bergsoe Metal Corp.*, 910 F.2d 668, 671 (9th Cir.1990); *see Snediker Developers*, 773 F.Supp. at 987; *Guidice v. BFG Electroplating and Manufacturing Co., Inc.*, 732 F.Supp. 556, 561 (W.D.Pa.1989).

### 1. *Purpose of Ownership*

■ As indicated by the language of CERCLA, a court determining whether the security interest exemption applies to a particular transaction is directed to the intent of the parties and the purpose of the transaction:

That the [defendant] holds paper title to the [subject property] does not, alone, make it an owner of the facility for purposes of CERCLA; under the security interest exception the court must determine *why* the [defendant] holds indicia of ownership.

*Bergsoe Metal Corp.,* 910 F.2d at 668 (emphasis in original); *see United States v. McLamb,* 5 F.3d 69, 72 (4th Cir.1993); *Snediker Developers,* 773 F.Supp. at 988. The nature of the title held by the defendant is irrelevant to this determination; it is the reason the defendant took title which guides the inquiry. *See United States v. Mirabile,* No. 84–2280, 1985 WL 97 at *6 (E.D.Pa. 6 Sept. 1985) ("Regardless of the nature of the title received by [the defendant], its actions with respect to the foreclosure were plainly undertaken in an effort to protect its security interest in the property."); *see also Waterville Industries,* 984 F.2d at 551 (finding owner was protected by security interest exemption though it took title "in fee simple").

■ No mechanical test has arisen to guide the determination as to the purpose of ownership; whether an owner's taking of title falls within the security interest exemption depends on the facts particular to each case. In general, however, the exemption protects "owners who[, by taking title,] are not in fact seeking to profit from the investment opportunity normally presented by prolonged ownership." *Northeast Doran, Inc.,* 15 F.3d at 2–3; *see McLamb,* 5 F.3d at 72 (holding that taking of title was for purposes of securing debt where "[t]he record reveal[ed] no investment or profit motive for acquiring the property").

As indicated, the exemption only requires that the defendant have taken title *"primarily ... to protect its security interest."* *McLamb,* 5 F.3d at 72 (emphasis added); *see* 42 U.S.C. § 9601(20)(A); *Bergsoe Metal Corp.,* 910 F.2d at 671. The fact that a party garners secondary benefits from its ownership of the property, such as depreciation of the property for tax purposes, will not void its entitlement to the exemption. As one congressional report noted:

[A] financial institution which held title primarily to secure a loan but also received tax benefits as the result of holding title would not be an "owner" as long as it did not participate in the management or operation of the vessel or facility.

H.R.Rep. No. 1016, 96th Cong.2d Sess., P.L. 96–510, *reprinted in* 1980 U.S.Code Cong. & Admin.News 6119, 6181.

There is scant authority applying the exemption to transactions of the type at issue here. It is clear, however, that Congress intended the exemption to apply to a defendant who holds title pursuant to a standard sale-leaseback arrangement. As one court noted:

In all events, legislative history and case law confirm that Congress had in mind not only the classic case of the bank mortgage but also equivalent devices serving the same function, such as lease financing arrangements.

*Waterville Industries,* 984 F.2d at 552 (exempting lessor in sale-leaseback from liability under CERCLA); *see Bergsoe Metal Corp.,* 910 F.2d at 671 (same); H.R.Rep. No. 1016, 96th Cong.2d Sess., P.L. 96–510, *reprinted in* 1980 U.S.Code Cong. & Admin.News 6181 (The term 'owner' "does not include certain persons possessing indicia of ownership (such as a financial institution) who, without participating in the management or operation of a vessel or facility, hold title either in order to secure a loan *or in connection with a lease financing arrangement* under the appropriate banking laws, rules or regulations." (emphasis added)).

A decision instructive to the inquiry at bar is *Waterville Industries,* 984 F.2d 549. There, the parties entered into a transaction which, though slightly more complicated than the one at bar, was essentially a sale-leaseback. Generally, in or about 1980, a textile manufacturer in Maine defaulted on loans it had taken to construct a mill. *Id.* at 550. In exchange for curing the manufacturer's de-

fault and assuming its future obligations, the Finance Authority of Maine ("FAME") received a deed to the property "and became the holder of title to the property." *Id.*

FAME simultaneously leased the property back to the manufacturer to allow the manufacturer to continue to operate the mill. *Id.* The lease required the manufacturer to pay, as rent, the amount of monthly debt assumed by FAME and an additional $22,340.00. *Id.* "During the period in which [the manufacturer] operated the mill as a lessee of FAME, [the manufacturer] released certain hazardous wastes into two lagoons associated with the mill." *Id.* at 551. FAME subsequently sold the mill and the attendant property to the plaintiff. *Id.*

In September 1988, the Environmental Protection Agency ("EPA") filed an administrative action against the plaintiff, seeking response costs under CERCLA. *Id.* The plaintiff brought an action seeking contribution from FAME pursuant to CERCLA section 107(a)(2), 42 U.S.C. § 9607(a)(2). FAME contended it was not an owner because it held title to the property primarily to secure the textile manufacturer's obligations to FAME. *See* 984 F.2d at 551. The district court held in favor of the plaintiff and found FAME liable for contribution. *Id.*

On appeal, the First Circuit reversed. The Circuit found that "what FAME received . . . through the . . . 1980 transactions was the nominal title typical of the lender in a lease financing transaction." *Id.* at 552. In making this determination, the Circuit found significant that, when FAME acquired title to the property, "it simultaneously released the property to [the textile manufacturer], altering the payment terms as already described." *Id.* The Circuit noted that, under these payment terms, the manufacturer was required to make payments in an amount equal to the initial debt to FAME plus a financing charge. *Id.* Other important factors listed by the court included the fact that the manufacturer "continued to be responsible for real estate taxes and [that] the payment terms provided that the monthly sums payable to FAME were to be applied first to 'interest,' which suggests repayment of a debt." *Id.* In light of these and other

factors, the Circuit concluded FAME was protected from CERCLA liability by the security interest exemption. *Id.* at 554.

Another instructive decision is *Bergsoe Metal Corp.,* 910 F.2d 668. There, a recycling company approached the Port of St. Helens (the "Port"), an Oregon municipal corporation, seeking financing for the construction of a lead recycling facility. *Id.* at 669. The Port subsequently sold the recycler fifty acres of land on which to construct the plant. In exchange, the recycler executed a promissory note in the amount of $400,-000.00 and a mortgage on the property in favor of the Port. *Id.* at 670.

The recycler and the Port then entered into a series of interlocking transactions designed to complete the financing for the construction of the plant. The first of these was a sale-leaseback whereby the recycler "conveyed to the Port by warranty deed the 50 acres and the recycling plant to be built there." *Id.* "The Port and [the recycler] then entered into two leases to cover the property at the plant." *Id.* The recycler agreed to pay rent "equal to the principal and interest to come due" on the commitment made by the Port. *Id.* In a separate transaction, the Port mortgaged the property to a bank and assigned to the bank its rights under the lease. *Id.*

The recycler began having financial difficulties and shut down a few years later. The bank placed the recycler in involuntary bankruptcy and filed suit to collect on the recycler's debts. The bank also sought a declaration that the recycler was liable for certain cleanup costs likely to be incurred on the property. *Id.* The recycler brought a third-party complaint, seeking contribution from the Port. *Id.* The Port responded that it was insulated from liability by the security interest exemption. *Id.*

The bankruptcy court granted summary judgment to the Port and the district court affirmed. On appeal, the Ninth Circuit affirmed. The Circuit began its analysis by noting that the crux of its inquiry was the determination as to why the Port held indicia of ownership. *Id.* at 671. The Circuit first noted the purpose of the transaction, con-

cluding that "[t]he Port received the warranty deeds as part of a transaction whose sole purpose was to provide financing for the plant." *Id.* The Circuit also noted that, while the Port took title to the property, "all other traditional indicia of ownership, such as responsibility for the payment of taxes and for the purchase of insurance" were retained by the lessee. *Id.* The Circuit found significant that "the leases assign[ed] to [the lessee] the risk of loss from destruction or damage to the property." *Id.*

"Even more telling," stated the Circuit, were "the terms of repayment under the leases." *Id.* One significant repayment term was that the "'rent' was equal to the principal and interest due" under the financing arrangement. *Id.* Based on these and other factors, the Circuit held there was "no doubt that the Port has the deed in the plant primarily to ensure that [the lessee] would meet its obligations under the leases and therefore under the [financing arrangement]." *Id.*

Cases and commentaries interpreting the Uniform Commercial Code, N.J.S.A. §§ 12A:1–101 *et seq.* (the "UCC"), are also instructive in determining whether a particular lease transaction was a security agreement or a true lease. It is recognized that the sections of the UCC regarding security interests, by their own terms, do not apply to "the creation of or transfer of an interest in or lien on *real estate,* including a lease or rents thereunder." N.J.S.A. § 12A:9–104 (emphasis added); *see* N.J.S.A. § 12A:1–201(37) (defining "security interest" as "an interest in personal property or fixtures which secures payment or performance of an obligation"). CERCLA and its security interest exemption, however, apply to owners and operators of "vessels" as well as real estate. 42 U.S.C. § 9601(20)(A). It is unlikely, therefore, that Congress intended the definition of a security interest to vary according whether the property at issue was real or personal.

It is, moreover, well-settled that

the resolution of questions of statutory interpretation may be aided by reference to the prevailing interpretation of other statutes that share the same language and either have the same general purpose or deal with the same general subject as the statute under consideration.

*de los Santos v. Immigration & Naturalization Service,* 525 F.Supp. 655, 666 (S.D.N.Y. 1981), *aff'd,* 690 F.2d 56 (2d Cir.1982); *see Northcross v. Board of Education of the Memphis City Schools,* 412 U.S. 427, 428, 93 S.Ct. 2201, 2202, 37 L.Ed.2d 48 (1973); *Johnson v. Goodyear Tire & Rubber Co.,* 790 F.Supp. 1516, 1524 (E.D.Wash.1992); *Local 478 Trucking and Allied Industries Pension Fund v. Jayne,* 778 F.Supp. 1289, 1321 (D.N.J.1991).

In defining the scope of the security interest exemption, CERCLA uses the same language, "security interest," as is used by the UCC. *Compare* 42 U.S.C. § 9601(20)(A) *with* N.J.S.A. § 12:1–201(37). The two statutes also apply the term to similar types of transactions. *Compare Waterville Industries,* 984 F.2d at 552 (finding Congress intended security interest exemption in CERCLA to apply to sale-leasebacks) *with BJL Leasing Corp. v. Whittington, Singer, Davis & Co., Inc.,* 204 N.J.Super. 314, 320, 498 A.2d 1262 (App.Div.1985) (holder of title in sale-leaseback retained security interest under UCC definition). In light of the similarity between the language and scope of the two provisions, the UCC may properly guide interpretation of CERCLA's security interest exemption. *See de los Santos,* 525 F.Supp. at 666.

Also, as the Supreme Court has noted:

Congress is understood to legislate against a background of common law ... principles. Thus, where a common-law principle is well established, ... the courts may take it as given that Congress has legislated with an expectation that the principle will apply except when a statutory purpose to the contrary is evident.

*Astoria Federal Savings and Loan Association v. Solimino,* 501 U.S. 104, 108, 111 S.Ct. 2166, 2169–70, 115 L.Ed.2d 96 (1991) (citations omitted); *see Isbrandtsen Co. v. Johnson,* 343 U.S. 779, 783, 72 S.Ct. 1011, 1014–15, 96 L.Ed. 1294 (1952); *cf. Butner v. United States,* 440 U.S. 48, 55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979) ("Property interests

are created and defined by state law.... Uniform treatment of property interests by both state and [F]ederal courts within a state serves to reduce uncertainty [and] to discourage forum shopping....").

Though the UCC is not common law, it has its origins in the common law of commercial transactions, and restates many common law principles. *See* N.J.S.A. § 12A:1–102; *see generally* 1 James J. White & Robert S. Summers, *Hornbook on the Uniform Commercial Code* (3d ed. 1988) ("White & Summers") 1–5. Moreover, the UCC, like common law, is applied fairly consistently across jurisdictions. *See id.* at 6. It is likely, therefore, that Congress was aware of UCC principles when drafting CERCLA, and drafted the security interest exemption "against a background of [such] principles." *Solimino*, 501 U.S. at 108, 111 S.Ct. at 2169.

CERCLA contains no definition of "security interest" but uses that term as it is used generally. 42 U.S.C. § 9601(20)(A); *see Waterville Industries*, 984 F.2d at 552 (determining existence of security interest under general principles of secured transactions). As indicated, Congress, when drafting CERCLA, was presumably aware of the principles governing the existence of a security interest under the UCC. *See Solimino*, 501 U.S. at 108, 111 S.Ct. at 2169–70. It may be inferred, therefore, that Congress, in drafting CERCLA's security interest exemption, intended that UCC principles governing the existence of security interests would aid in determining whether such an interest existed for the purposes of CERCLA. *Id.*

In determining whether a leasing arrangement creates a security interest, the UCC "refers the court to the intent of the parties, making clear that substance rather than form is to be determinative of the nature of an agreement." *Basic Leasing, Inc. v. Paccar*, No. 89–4963, 1991 WL 117412 at *3 (D.N.J. 24 June 1991); *see BJL Leasing Corp.*, 204 N.J.Super. at 320, 498 A.2d 1262. Under the UCC, "whether a lease is intended as security is to be determined by the facts of each case." N.J.S.A. § 12A:1–201(37).

The courts addressing the issue have generally agreed that the inquiry into whether the parties "intended" to create a security interest is fact sensitive.

. . . . .

[T]he appropriate course to follow is to analyze all the relevant factors surrounding the lease agreement and relationships created therein, in determining if the parties intended to create a security interest. [T]his approach [is] preferable to adoption of a rigid test or set of criteria because of the fact sensitive nature of the inquiry and the need for a flexible analytical framework that enables the court to analyze the totality of the facts presented.

*Sight and Sound of Ohio, Inc. v. Wright*, 36 B.R. 885, 889–90 (S.D.Ohio 1983).

The factors considered by courts in finding that a lease constitutes a security interest are varied and numerous:

Of note is that courts consider the lessor's status as a financier to be relevant. So, too, such factors as whether the lessee is required to insure the goods in favor of the lessor for a value equal to the total rental payments; the risk of loss or damage is on the lessee; the lessee is to pay for taxes, repairs and maintenance; there are default provisions governing acceleration and resale; a substantial, non-refundable deposit is required; the goods are to be selected from a third party by the lessee; the rental payments are equivalent to the cost of goods plus interest;[13] the lessor lacks facilities to store or retake the goods....

2 White & Summers 251–52.

Courts interpreting New Jersey law have held similarly, finding the following factors relevant in determining that a lease constituted a security agreement:

(1) The lessee was required to provide insurance against loss, theft, damage, and destruction of the leased equipment.

(2) The lessee was required to bear the entire risk of loss, theft, damage, or de-

---

**13.** Of particular significance in determining that a lease constitutes a security agreement is that the rental payments are intended to amortize the purchase price of the property. *See* 2 White & Summers 248.

struction and no such loss would relieve the lessee of its obligation to pay rent.

(3) The lessee was required to indemnify and hold harmless the lessor from all claims and liabilities arising in connection with the equipment.

(4) The lessee was required to pay all charges and taxes imposed upon the ownership, leasing, renting, sale, purchase, possession, or use of the equipment, except taxes based on the lessor's net income.

(5) The lessee was required to pay a substantial deposit upon acceptance of the lease.

(6) A provision in the contract accelerated the rental payments and mandated that the lessee pay attorney fees in the event of default.

(7) A provision specifying the supplier of the equipment to be leased suggested that the lessor purchased the equipment specifically for the lessee.

*Citi–Lease Company v. Entertainment Family Style, Inc.,* 825 F.2d 1497, 1499–1500 (11th Cir.1987) (interpreting New Jersey law); *Basic Leasing, Inc.,* 1991 WL 117412 at *4 (listing identical factors); *Leasing Service Corp. v. American National Bank & Trust Co.,* 19 U.C.C.Rep. 252, 260, 1976 WL 23674 (D.N.J.1976) (same). "This list is not exhaustive. Nor is any one factor conclusive standing alone. Each transaction must be viewed on its facts...." 2 White & Summers 252.

The determination as to the nature of the transaction should be based on the relevant facts and the intentions of the parties as they existed at the outset of the lease and not on events which occurred thereafter. *Id.* at 250, 254.

> Parties make the agreement at the outset. It is only there that they have the common intention to create a lease or security agreement, and it is at that time we should measure the economic realities to determine their true intention.

*Id.* at 250. This approach is further supported by proposed amendments to the UCC, which provide that essential characteristics of the transaction "are to be determined with reference to the facts and circumstances at the time the transaction is entered into." *See id.* at 253 (quoting proposed amendments).

### *Significance of an Option to Repurchase*

■ In determining that the sale-leasebacks at issue were security arrangements, the decisions in *Waterville Industries* and *Bergsoe Metal Corp.* relied to some extent on the existence, in the leases at issue, of an option to repurchase the property for nominal consideration. *See Waterville Industries,* 984 F.2d at 552; *Bergsoe Metal Corp.,* 910 F.2d at 671. Likewise, under the UCC, a lessee's option to acquire the property at the end of the lease "for no additional consideration or for a nominal consideration does [as a matter of law] make the lease one intended for security." N.J.S.A. § 12A:1–201(37). Plaintiffs argue, therefore, that a leaseback must contain a repurchase option in order to be deemed a security arrangement. *See* Plaintiffs' Summation at 16.

The existence of a repurchase option, though relevant in determining the nature of a leaseback, is by no means necessary to a determination that the leaseback constitutes a security arrangement. The court in *Waterville Industries* did not indicate anything talismanic about the existence of a repurchase option, but merely stated "FAME's current position [that the leaseback was a security arrangement] *could* be weaker" in the absence of a repurchase option. 984 F.2d at 553 (emphasis added). Similarly, the court in *Bergsoe Metal Corp.* merely listed the existence of a repurchase option in the midst of several other factors which indicated the leaseback was a security arrangement. 910 F.2d at 671.

Analysis of the UCC is particularly instructive on this point. Though the UCC makes the existence of an option to repurchase for nominal consideration sufficient to create a security interest, the existence of such an option is not necessary to the creation of a security interest. As indicated, no one factor is dispositive of whether a lease is intended for security. 2 White & Summers 252. Accordingly,

> a nominal repurchase option need not appear in the [lease] agreement for the lease

to be intended for security. Even if there is no purchase option or the purchase option is not for nominal consideration, the lease may be "intended for security" under [the UCC]. Courts take into account a wide variety of other factors in making their determination.

*Id.* at 251.

Significantly, the absence of a repurchase option will not be relevant where the reversionary interest is of little or no value. For example, a proposed amendment to the UCC provides that a lease will create a security interest where there is a nominal repurchase option, or, *inter alia,* the "term of the lease is equal to or greater than the remaining economic life of the goods. . . ." [14] 2 White & Summers 252; *see Basic Leasing, Inc.,* 1991 WL 117412 at *4.

> Under this provision[,] a court must first compare the lease term with the economic life of the goods to determine whether a reversionary interest exists. If it does not, the transaction was a secured sale.

2 White & Summers 254; *cf. Basic Leasing,* 1991 WL 117412 at *6 (finding lease agreement was not secured transaction in large part because "the lease periods at issue did not extend beyond the economic life of the [property]"); *In re Cress,* 106 B.R. 246, 250 (D.Kan.) (same), *aff'd,* 930 F.2d 32 (10th Cir. 1989). Although this proposed amendment has not yet been adopted by the New Jersey legislature, "it is helpful to include it in this analysis as one attempt to clarify the case law and dispel some of the uncertainty regarding the interpretation of the old [definition of security interests under the UCC]." *Basic Leasing, Inc.,* 1991 WL 117412 at *4 ("The amended subsection codifies much of the prior case law. . . .").

■ Viewing the USR Leaseback as a whole, and in light of the totality of facts surrounding the relationship between Prudential and USR, it is apparent Prudential held title to Lot 13 primarily to protect its security interest in the property. Prudential concedes it took possession of the 1950 Deed, evidencing its title ownership of Lot 13. Stipulation, ¶¶ 27, 29. The inquiry here, however, is why Prudential held this indicia of ownership. *Bergsoe Metal Corp.,* 910 F.2d at 668.

### a. *Prudential's Evaluation of the USR Leaseback*

As indicated, the USR Leaseback was a part of the Program. Tr. at 85. In administering the Program, Prudential acted as a financier and was not interested in owning or operating an industrial facility. *Id.* at 74, 86. In fact, as a financier, and not a chemical manufacturer, Prudential did not have the capacity to operate an industrial facility of the type constructed on Lot 13. *See* Tr. at 130; *see also* 2 White & Summers 251 (the role of the lessor as a financier and the inability of the lessor to retake the goods are significant in determining a lease is for security).

USR selected Lot 13 for its own use and approached Prudential for financing. Stipulation, ¶¶ 18–20. It was also USR which proposed to build the USR Building on Lot 13 according to its own specifications. Davenport Dep. at 8–9. USR hired the Contractor to construct the USR Building. *Id.* at 8. USR's control over the selection and use of the property indicate Prudential took title to the property not to obtain the conventional benefits of ownership, but to protect its financing of USR's expansion. *See Citi–Lease Company,* 825 F.2d at 1500 (evidence that lessor purchased property specifically for lessee indicates lease was taken as security); 2 White & Summers 252 (lease is security agreement where "the goods are to be selected from a third party by the lessee").

Like the typical creditor in a sale-leaseback, Prudential was primarily concerned with USR's creditworthiness. Tr. at 85; *see id.* at 75–76. In this regard, Prudential intended that USR be required to submit audited financial statements annually. *See* 2 May 1950 Memo at 2. Prudential also reserved the right to cancel the transaction if

---

**14.** Under the proposed amendment to the UCC, a lease will also be deemed to have created a security interest where "the lessee has an option to renew the lease for the remaining economic life of the goods for no additional consideration or nominal consideration upon compliance with the lease agreement." 2 White & Summers 253; *see Basic Leasing,* 1991 WL 117412 at *4.

USR incurred construction costs significantly in excess of those expected. *Id.*

With respect to Lot 13 and the USR Building, Prudential was concerned not with potential uses of this property or its ownership value to Prudential; Prudential was concerned only with whether the value of the property was sufficient to secure its commitment. As indicated, Prudential resolved to 'purchase' the property for no more than 95.5% of its appraised value. *See id.* at 1. Similarly, Prudential and USR did not view the amount Prudential committed to USR as a purchase price for the USR Building and Lot 13, but rather as a loan. As stated, Prudential would extend only up to $179,000.00 for the property, regardless of its ultimate cost; USR was required to pay any costs of construction in excess of Prudential's commitment. *Id.* If USR and Prudential had intended the transaction for Prudential's ownership and benefit, USR certainly would not have agreed to pay any costs of constructing the USR Building over and above Prudential's commitment.

In structuring rental payments, Prudential sought to "amortize" the cost of the Lot 13 and the USR Building over the initial term and gain a modest 5% return on its commitment. *Id.* The 2 May 1950 Memo spoke of proposed rent figures in terms of percentages of Prudential's commitment to USR, and estimated the date upon which Prudential's commitment would be fully repaid and the amount of "interest" which would be accrued on that date. *Id.* The payment schedule set forth in the Lease was similarly structured to amortize the amount committed by Prudential over the useful life of the property.[15] *See* Lease at 2; Tr. at 88–89, 140. Structuring of rental payments in this manner is typical of a security arrangement. *See Waterville Industries,* 984 F.2d at 552.

In reviewing USR's proposal, Prudential also intended that USR be liable for all "taxes, assessments, water charges, insurance and utilities" associated with Lot 13. Pru-

dential's intention in this regard is also consistent with the expectations of a secured creditor; it is not consistent with the expectations of a landlord. *See Citi–Lease Company,* 825 F.2d at 1500; 2 White & Summers 251–52.

Prudential's evaluation of the USR Leaseback indicates it intended to purchase Lot 13 and the USR Building not to garner the benefits of ownership, but to secure USR's obligation to repay Prudential's commitment. Tr. at 183. *See Bergsoe Metal Corp.,* 910 F.2d at 671 (finding leasing arrangement constituted security agreement where the "sole purpose [of the lease] was to provide financing for the plant").

#### b. *The Leaseback Contract and the Lease*

The Leaseback Contract and the Lease itself properly implemented Prudential's intention in this regard. Pursuant to the Leaseback Contract, Prudential, upon obtaining the 1950 Deed indicating its paper ownership of Lot 13 and the USR Building, simultaneously leased the property back to USR. Stipulation, ¶¶ 24, 28. Prudential never possessed the property. This fact indicates Prudential held the property only to protect its security interest and not "to profit from the investment opportunity normally presented by prolonged ownership." *Northeast Doran, Inc.,* 15 F.3d at 2–3; *see Waterville Industries,* 984 F.2d at 552 (finding simultaneous re-lease significant in determining transaction was security agreement).

The Lease itself is particularly indicative of the securitized nature of the USR Leaseback. As planned in the 2 May 1950 Memo, USR was required by the Lease to submit to Prudential annual profit, loss and income statements and a certified balance sheet. *See* Lease, Art. XXIV. USR was further required to provide Prudential with "all such financial statements, reports and returns as it shall send to its stockholders." *Id.* Prudential's entitlement to information regarding USR's financial condition and creditwor-

---

**15.** As indicated, rental payments under the Lease were structured so as to amortize Prudential's commitment, with 5% interest, during the initial term of the Lease. 2 May 1950 Memo at 1. All payments thereafter, during the renewal terms, were nominal. Tr. at 140. Even if USR had exercised all of its options under the Lease, the return to Prudential would still have been only 6%. *Id.* at 180.

thiness indicates Prudential and USR were in a creditor/debtor relationship.

As indicated, the Lease structured USR's rental payments so as to amortize the amount committed by Prudential in the Leaseback Contract over the useful life of Lot 13 and the USR Building. Tr. at 88–89, 140. Also as indicated, such structuring of rental payments is highly indicative of a secured transaction. *See Bergsoe Metal Corp.,* 910 F.2d at 671; 2 White & Summers 252.

The Lease also placed on USR all the obligations incident to ownership. For example, the Lease placed on USR the responsibility for "all real estate taxes, assessments, water rates and charges, and other governmental charges...." Lease, Art. III, § 1. These payments were the absolute obligation of USR and were not subject to offset against rental payments.[16] *Id.,* Art. III, § 2. Such a provision also indicates the Lease was in fact a security agreement. *See Waterville Industries,* 984 F.2d at 552; *Bergsoe Metal Corp.,* 910 F.2d at 671; *Citi–Lease Company,* 825 F.2d at 1500.

Under the Lease, USR was required, "at its sole cost and expense," to insure Lot 13 and the USR Building against any loss or damage caused by natural disaster or manmade hazards. Lease, Art. IV, § 1. USR was also responsible for obtaining liability insurance, steam boiler insurance and war damage insurance in relation to Lot 13. *Id.,* Art. IV, § 2. USR's sole responsibility for the insurance of Lot 13 and the USR Building militates strongly in favor of finding the USR Leaseback was a security arrangement. *See Bergsoe Metal Corp.,* 910 F.2d at 671; *Citi–Lease Company,* 825 F.2d at 1500; 2 White & Summers 252.

Unlike the average tenant in a lease, USR was required, at its sole expense, to make all necessary repairs to Lot 13 and the USR Building and to keep the property in good condition and free of obstructions.[17] Lease, Art. VI. While structural alterations were subject to prior approval by Prudential, such a provision is not inconsistent with Prudential's role as a creditor. Tr. at 96 (right to approve structural changes is consistent with rights of a mortgagee under a mortgage loan). A creditor, after all, has an interest in ensuring its collateral is not destroyed or significantly reduced in value. *See Bergsoe Metal Corp.,* 910 F.2d at 672 (lessor's role in planning construction on leased property is consistent with role of a creditor); *cf.* Lease, Art. VIII (providing that alterations could not "reduce, or otherwise adversely affect, the value of" Lot 13). In view of the Lease as a whole, USR's responsibility for repair and maintenance indicates the USR Leaseback was a secured transaction. 2 White & Summers 252.

Unlike a true owner of real property, Prudential was not liable for any claims or costs relating in any respect to Lot 13 or the USR Building. Pursuant to the Lease, USR was obligated to "indemnify and hold harmless" Prudential against all claims "arising from the conduct or management of or from any work or thing whatsoever done in or about [Lot 13]." Lease, Art. XV, § 1. In addition, USR was solely liable for all claims arising from the condition of property adjoining Lot 13. *Id.* These indemnification provisions are also indicative of a secured transaction. *See Citi–Lease Company,* 825 F.2d at 1500.

The USR Leaseback also conveyed to USR all the normal benefits incident to ownership of real property. *See* Tr. at 183. For example, USR had the right to "assign or transfer" its rights under the Lease or to "sublease the whole or any part of [Lot 13]" without the consent of Prudential. Accordingly, USR was entitled to reap the benefit of any appreciation in the value of the property during its useful life.[18] *Id.* at 143.

---

**16.** The Lease also provided USR with the right to contest the amount and/or validity of tax assessments levied with respect to Lot 13. Lease, Art. III, § 5. This provision is also indicative of Prudential's separation from the normal incidents of ownership.

**17.** USR was also required to make whatever arrangements were necessary to procure utility

service such as gas, electricity and telephone service for Lot 13 and the USR Building. Lease, Art. XIV.

**18.** As discussed, USR was entitled under the Lease to occupy Lot 13 and the USR Building for a period longer than the useful life of the property. *See supra* at 382.

USR was also entitled to make alterations and improvements upon Lot 13 as it "deem[ed] necessary or desirable in connection with its business...."[19] Lease, Art. VIII. Moreover, as indicated, USR had sole control over the specifications of the USR Building. Davenport Dep. at 8. It was, therefore, USR, and not Prudential, which gained primary ownership benefits from the use of Lot 13. *See Citi–Lease Company,* 825 F.2d at 1500 (evidence that property was acquired specifically for use of lessee indicated security agreement).

In asserting Prudential did not own Lot 13 to protect a security interest, Plaintiffs rely primarily on the absence of a repurchase option in the Lease. As indicated, the existence of a repurchase option is not the *sine qua non* of a secured transaction, but merely one factor among many indicating a security interest. *See* 2 White & Summers 251–52; *see also Bergsoe Metal Corp.,* 910 F.2d at 671. The absence of such an option is not inconsistent with the conclusion that a lease is intended as security. 2 White & Summers 251–52.

The absence of a repurchase option is, moreover, of slight relevance in the instant case. As indicated, there was no expectation of residual value in leased industrial property in 1950, when the USR Leaseback was consummated.[20] Tr. at 134. Accordingly, a repurchase option was not deemed a significant provision in a sale-leaseback and was commonly omitted from such transactions. *Id.* at 185; *see Ellwood Tables* at 117.

Similarly, Lot 13 and the USR Building were expected by Prudential to be of insignificant value by the end of USR's occupancy. *Id.* at 138–40. The economic life of the USR Building was projected as only twenty-five years. *Id.* at 137. The useful life of the USR Building and Lot 13 was projected as thirty-five to forty years. As indicated, USR had the right to exclusive possession of the property for up to sixty-five years.[21] Lease, Art. XX, § 1. USR, therefore, retained the full benefits of ownership well beyond the useful and economic life of the property. The slight anticipated reversionary value of Lot 13 and the USR Building render the absence of a repurchase option irrelevant for the purposes of the instant inquiry. *See Basic Leasing,* 1991 WL 117412 at *6; 2 White & Summers 252.

As indicated, USR had reason to seek exclusion of a repurchase option from the Lease. As stated, inclusion of a repurchase option in the Lease would have deprived USR of significant tax benefits. Tr. at 143–44. These benefits were worth far more to USR than the insignificant reversionary value of Lot 13 and the USR Building. It is likely, therefore, that the exclusion of a repurchase option from the Lease was not intended to preserve a benefit of ownership for Prudential, but was, instead, bargained for by USR. It would be inequitable to place on Prudential the onus of a decision it likely deemed a concession when it was made.

It is recognized that Prudential did retain certain secondary benefits of ownership. For example, as Plaintiffs point out, Prudential depreciated Lot 13 and the USR Building for Federal tax purposes. Tr. at 192–94. In 1950, however, Prudential was not required to pay the full rate of taxation on its investments. *Id.* at 60. The slight and incidental economic benefit provided by tax depreciation was clearly of secondary importance to Prudential in entering into the USR Leaseback. The existence of such an incidental benefit of ownership does not controvert the conclusion that Prudential took title to Lot 13 and the USR Building "primarily" to protect

---

19. As indicated, Prudential's right to approve structural alterations was not inconsistent with its role as a secured creditor. *See Bergsoe Metal Corp.,* 910 F.2d at 672.

20. In administering the Program, Prudential "made the assumption that [the leased properties] wouldn't be worth anything [upon expiration of the lease] because ... [its] primary purpose was to get [its] money back." Tr. at 90.

21. The rental payments for the renewal terms, as indicated, were nominal. Tr. at 140. Therefore, even if the economic life of Lot 13 and the USR Building were greater than the twenty-five year initial term of the Lease, USR had "an option to renew the [L]ease for the remaining economic life of the [property] for ... nominal consideration...." 2 White & Summers 253; *see Basic Leasing,* 1991 WL 117412 at *4. The existence of such an option is strongly indicative of a security agreement. *Id.*

a security interest. *McLamb*, 5 F.3d at 72; *see* H.R.Rep. No. 1016, 96th Cong.2d Sess., P.L. 96–510, *reprinted in* 1980 U.S.Code Cong. & Admin.News 6181 ("[A] financial institution which held title primarily to secure a loan but also received tax benefits as the result of holding title would not be an 'owner....' ").

Plaintiffs also point out that Prudential was entitled to the entire award in an eminent domain proceeding relating to Lot 13. *See* Lease, Art. XVII, § 1. Plaintiffs argue that it would have been more consistent with the role of a secured creditor if Prudential were only entitled to recover an amount up to its initial commitment. Plaintiffs have submitted nothing, however, to suggest an eminent domain award in relation to Lot 13 would necessarily have exceeded Prudential's commitment.[22]

In any event, in 1950, the probability of condemnation for industrial properties was slight. Tr. at 115. Accordingly, any eminent domain benefits expected by Prudential were clearly not its primary purpose in entering the USR Leaseback, and do not significantly bear on whether the transaction was entered into primarily to protect a security interest.[23] *See McLamb*, 5 F.3d at 72.

This is not a case where each and every relevant factor weighs in the secured creditor's favor; such an occurrence would be rare indeed. The instant inquiry, however, does not require mechanical adherence to some test or the fulfillment of a list of elements. *See Basic Leasing*, 1991 WL 117412 at *5. Rather, the transaction must be characterized after viewing the totality of the facts surrounding transaction and the relationships created therein; no one factor can be determinative. *Wright*, 36 B.R. at 889–90.

In the instant case, it is indisputable that the weight of the relevant factors indicate the USR Leaseback was not a simple sale of property but a secured transaction. Prudential took title to Lot 13 and the USR Building primarily to secure USR's obligations under the Lease, and not "to profit from the investment opportunity normally presented by prolonged ownership." *Northeast Doran, Inc.*, 15 F.3d at 2–3. For the purposes of CERCLA, therefore, Prudential held indicia of ownership over this property "primarily to protect [its] security interest" in Lot 13. 42 U.S.C. § 9601(20)(A); *see Waterville Industries*, 984 F.2d at 552.

### 2. *Participation in Management of Facility*

As indicated, a party seeking to invoke the security interest exemption to CERCLA must establish "it did not participate in the management of the plant." *Bergsoe Metal*

**22.** In light of the rapid depreciation expected in the value of Lot 13 and the USR Building, it was unlikely in 1950 that an award in an eminent domain proceeding would exceed Prudential's commitment.

**23.** Plaintiffs also point out that the 1950 Deed was marked with $196.00 in revenue stamps. 1950 Deed at 1. Plaintiffs assert that, under then existing statutes, such revenue stamps were not required in relation to a deed transferred to secure a debt. Plaintiffs' Proposed Findings, ¶ 61. For this proposition, Plaintiffs rely on "53 Stat. [§ ] 3480–82." *Id.*

These provisions are part of chapter 31 of the Internal Revenue Code of 1939, 53 Stat. §§ 3480–83. Section 3480 provides generally that taxes on documents and other written instruments shall be imposed pursuant to the other provisions of chapter 31. 53 Stat. § 3480. Section 3481 was repealed effective 1 July 1939. 53 Stat. § 3481(b).

Section 3482, upon which Plaintiffs ostensibly intend to rely, provides for a tax on deeds and other instruments transferring ownership in real property. 53 Stat. § 3482. That provision does provide that it shall not apply to "any instrument or writing given to secure a debt." *Id.* However, section 3482 also, by its own terms, applies only to a "[d]eed, instrument or writing delivered before July 1 1939." *Id.* Because the USR Leaseback occurred in 1950, the provision cited by Plaintiffs does not appear to have any relevance to the characterization of the USR Leaseback.

Even if tax regulations prevailing in 1950 did provide an exemption for deeds given to secure a debt, the inclusion of revenue stamps on the 1950 Deed does not necessarily indicate the instrument was transferred for reasons other than to secure USR's debt. It is possible, if not probable, that Prudential thought the $196.00 in revenue stamps was a small price to pay to avoid complications in a $179,000.00 transaction. Plaintiffs have offered *no testimony* or documentary evidence indicating that Prudential's inclusion of revenue stamps on the 1950 Deed was motivated by a belief that the USR Leaseback was not a secured transaction.

*Corp.*, 910 F.2d at 671; *see* 42 U.S.C. § 9601(20)(A). The issue of what constitutes 'participation in management' for a secured lender has created broad controversy and extensive litigation. *See, e.g., Fleet Factors Corp.*, 901 F.2d at 1556.

This issue need not be resolved conclusively here. "It is clear from the statute that, whatever the precise parameters of 'participation,' there must be *some* actual management of the facility before a secured creditor will fall outside the exemption." *Bergsoe Metal Corp.*, 910 F.2d at 672 (emphasis in original). "Mere financial ability to control waste disposal practices of the sort possessed by the secured creditor ... is not ... sufficient for the imposition of liability." *Mirabile*, 1985 WL 97 at *4; *see United States v. New Castle County*, 727 F.Supp. 854, 866 (D.Del.1989).

"That a secured creditor reserves certain rights to protect its investment does not[, moreover,] put it in a position of management." *Bergsoe Metal Corp.*, 910 F.2d at 672. Significantly, a creditor/lessor's retention and exercise of the right to inspect the premises will not remove the creditor from the security interest exemption. *Id.; see Northeast Doran, Inc.*, 15 F.3d at 3 ("Standing alone, ... the existence of a site assessment, even one which reveals the existence of possible environmental contamination ..., is insufficient to remove a holder [of title] from the 'security interest holder' exception....").

A secured creditor's participation in the planning of construction on leased property will not constitute 'participation in management:'

> Creditors do not give their money blindly, particularly the large sums of money needed to build industrial facilities.... A secured creditor will always have some input at the planning stages of any large-scale project.... If this were "management,"

no secured creditor would ever be protected.

*Bergsoe Metal Corp.*, 910 F.2d at 672.

In the instant case, there was no participation by Prudential in the management of Lot 13 or the USR Building. Prudential, as stated, did not participate in the operations or management of properties involved in the Program. Tr. at 86–87. Senior employees of USR who were employed at the USR Building during Prudential's titular ownership testified they never saw an employee of Prudential on Lot 13 and never even knew of any connection between Prudential and Lot 13. *See* Wilson Dep. at 17–18; Nairn Dep. at 12–13; Mattis Dep. at 13. Faced with this evidence, Plaintiffs submitted no evidence indicating Prudential was involved in the operations or management of Lot 13 or the USR Building.[24]

Prudential held titular ownership to Lot 13 and the USR Building primarily to protect its security interest in the property and did not participate in the operation or management of Lot 13 or the USR Building. Prudential, therefore, is exempt from liability under CERCLA as an owner or operator. *See* 42 U.S.C. § 9601(20)(A); *Bergsoe Metal Corp.*, 910 F.2d at 671. Accordingly, judgment will be entered in Prudential's favor on Count I of the Second Amended Complaint.

B. *Prudential's Status under the Spill Act*

Count II, as indicated, seeks recovery against Prudential under the Spill Act. The Spill Act was enacted in 1976 "to control the transfer and storage of hazardous substances and to provide liability for damage sustained within [New Jersey] as a result of any discharge of said substances, by requiring the prompt containment and removal of such pollution...." N.J.S.A. 58:10–23.11a.

Pursuant to section 23.11f of the Spill Act:

---

**24.** The only involvement Prudential may have had with Lot 13 was through periodic ride-by inspections. As indicated, such inspections were commonly performed in relation to properties involved in the Program. Tr. at 86. However, as stated, such involvement does not constitute participation in management and is insufficient

to void Prudential's entitlement to the security interest exemption. *Bergsoe Metal Corp.*, 910 F.2d at 672. Prudential's inspection of the premises to ensure the continuing viability of its collateral is entirely consistent with the rights of a secured creditor. *Id.*

Whenever any hazardous substance is discharged, the [New Jersey] [D]epartment [of Environmental Protection ("DEP")] may, in its discretion, act to clean up and remove or arrange for the cleanup and removal of such discharge or may direct the discharger to clean up and remove, or arrange for the cleanup and removal of, such discharge.

N.J.S.A. 58:10–23.11f(a)(1).

The Spill Act imposes strict liability for pollution cleanup and removal costs, "no matter by whom incurred," upon "any person who has discharged a hazardous substance, or is in any way responsible for any hazardous substance." N.J.S.A. 58:10–23.11g(c)(1). Such persons are liable "jointly and severally." *Id.* Under the Spill Act, "[s]uch person shall also be strictly liable, jointly and severally, without regard to fault, for all cleanup and removal costs incurred by the [DEP] or a local unit pursuant to ... [section] 23.11f." *Id.*

Effective 10 January 1992, section 23.11f was amended to include a private right of contribution among joint tortfeasors. *See* N.J.Pub.L. 373. The amendment to section 23.11f provides, in relevant part:

Whenever one or more dischargers or persons cleans up and removes a discharge of a hazardous substance, those dischargers and persons shall have a right of contribution against all other dischargers and persons in any way responsible for a discharged hazardous substance who are liable for the cost of cleanup and removal of that discharge of a hazardous substance. In an action for contribution, the contribution plaintiffs need prove only that a discharge occurred for which the contribution defendant or defendants are liable pursuant to the provisions of [N.J.S.A. 58:10–23.11g(c)].... In the resolving of contribution claims, a court may allocate the costs of cleanup and removal among liable parties using such equitable factors as the court determines are appropriate.

N.J.S.A. 58:10–23.11f(a)(2). It is under this provision that Count II seeks recovery.

On 7 May 1993, the Spill Act was again amended to provide an exemption for secured creditors much like that provided in CERCLA. L.1993 c. 112 § 1. Pursuant to section 23.11g5 of the Spill Act:

A person who maintains indicia of ownership of a vessel or facility primarily to protect a security interest in a vessel or facility and who does not participate in the management or the vessel or facility is not deemed to be an owner or operator of the vessel or facility, shall not be deemed the discharger or responsible party for a discharge from the vessel or facility and shall not be liable for cleanup costs or damages resulting from discharges from the vessel or facility....

N.J.S.A. § 58:10–23.11g5.

### 1. *Retroactive Application of the Spill Act's Security Interest Exemption*

This action was commenced on 15 January 1992. Prudential was added as a defendant on 26 August 1992. As indicated, the security interest exemption to the Spill Act was enacted in May 1993. *See* L.1993 c. 112 § 1. Though neither party has briefed the issue, it must be determined whether the Spill Act's security interest exemption can be applied retroactively to bar Plaintiff's Spill Act claim.

■ "As a general rule, changes to statutory law in New Jersey are applied prospectively rather than retroactively." *Bowen Engineering v. Estate of Reeve,* 799 F.Supp. 467, 479 (D.N.J.1992); *see Analytical Measurements v. Keuffel & Esser Co.,* 843 F.Supp. 920, 929 (D.N.J.1993); *Twiss v. New Jersey Dept. of the Treasury,* 124 N.J. 461, 466, 591 A.2d 913 (1991); *Gibbons v. Gibbons,* 86 N.J. at 522, 521, 432 A.2d 80. Nonetheless, this general rule, like all rules of statutory construction, will bend "where supervening considerations clearly compel a contrary determination." *Twiss,* 124 N.J. at 467, 591 A.2d 913; *see Bowen Engineering,* 799 F.Supp. at 479.

The New Jersey Supreme Court has recognized three exceptions to the general rule against retroactive application:

Courts will apply statutes retroactively when the Legislature has expressed its intent, either explicitly or implicitly, that the statute should be so applied; when the statute is curative; or when the reasonable

expectations of those affected by the statute warrant such application. *Twiss,* 124 N.J. at 467, 591 A.2d 913; *see Analytical Measurements,* 843 F.Supp. at 929 (utilizing same exceptions in determining that Spill Act's contribution provision, N.J.S.A. § 58:10–23.11f(a)(2), applied retroactively); *Bowen Engineering,* 799 F.Supp. at 479–80 (same); *see also Gibbons,* 86 N.J. at 523, 432 A.2d 80.

"The 'curative' exception comes into play when a statute amends a previous law which is unclear or which does not effectuate the intent of the Legislature in adopting the original act." *Bowen Engineering,* 799 F.Supp. at 480; *see Fasching v. Kallinger,* 227 N.J.Super. 270, 274, 546 A.2d 1094 (App. Div.1988), *certif. denied,* 114 N.J. 505, 555 A.2d 623 (1989). For example, the New Jersey Supreme Court has indicated a statute should be applied retroactively where "it reflects the Legislature's attempt to improve a statutory scheme already in existence." *Gibbons,* 86 N.J. at 524, 432 A.2d 80.

 The legislative history and language of the Spill Act's security interest exemption make it apparent that the provision was enacted as a curative measure. The bill proposing the security interest exemption to the Spill Act was introduced in the New Jersey Senate on 16 March 1992 (the "1992 Bill").[25] *See* S.577 (16 Mar. 1992). The 1992 Bill is accompanied by a "Statement," setting forth the purpose of the proposed exemption (the "1992 Statement"):

> This bill supplements the "Spill Compensation and Control Act" to limit the liability of a holder of a security interest who, without participating in the management of a vessel or facility, acts primarily to protect his security interest in the vessel or facility.

*Id.* at 4.

As indicated by the 1992 Statement, the security interest exemption was enacted to

"supplement" the Spill Act, and to "limit" liability which the New Jersey Legislature apparently found was unjustly imposed by the Spill Act as originally enacted.[26] *Id.* It appears, therefore, that the Spill Act's security interest exemption "reflects the Legislature's attempt to improve a statutory scheme already in existence." *Gibbons,* 86 N.J. at 524, 432 A.2d 80.

The security interest exemption contained in the Spill Act, moreover, substantially mirrors the language of CERCLA's security interest exemption. *Compare* N.J.S.A. § 58:10–23.11g5 *with* 42 U.S.C. § 9601(20)(A). The similarity in the language of the provisions indicates the New Jersey Legislature's intent to bring the Spill Act into conformity with analogous Federal laws concerning environmental responsibility. Because the Spill Act's security interest exemption is curative in nature, it will be applied retroactively. *See Twiss,* 124 N.J. at 467, 591 A.2d 913.

### 2. The Spill Act's Security Interest Exemption

As stated, the Spill Act exempts from liability "a person who maintains indicia of ownership of a vessel or facility primarily to protect a security interest in a vessel or facility and who does not participate in the management of the vessel or facility. . . ." N.J.S.A. § 58:10–23.11g5. The security interest exemption to the Spill Act, therefore, requires proof of the same elements which are required by the CERCLA exemption: (1) that indicia of ownership is held primarily to protect a security interest, and (2) that the secured creditor did not participate in the management of the subject property. *See Bergsoe Metal Corp.,* 910 F.2d at 671.

Unlike CERCLA, the Spill Act contains detailed definitions of these elements. Under the Spill Act:

---

**25.** The security interest exemption, as enacted, is substantively identical to the 1992 Bill. *Compare* N.J.S.A. § 58:10–23.11g4–g5 *with* S. 577 (16 Mar. 1992).

**26.** The 1992 Bill also proposed certain amendments to the New Jersey Environmental Cleanup Responsibility Act ("ECRA"), N.J.S.A. 13:1K–6 *et seq.* Specifically, the 1992 Bill sought to limit the applicability of ECRA's requirements in

transactions involving security interests. S. 577 at 3. In hearings on the proposed ECRA amendments, several witnesses from the business community complained of the extensive ECRA liability of secured lenders, and the effect of that liability on the state economy. *See generally* Transcript of Public Hearing Before Senate Environment Committee (16 Mar. 1992).

"Primarily to protect a security interest" means that the holder's indicia of ownership are held primarily for the purpose of securing payment or performance of an obligation but does not include indicia of ownership held primarily for investment purposes, nor ownership indicia held primarily for purposes other than as a protection for a security interest. *A holder may have other, secondary reasons for maintaining indicia of ownership,* but the primary reasons why any ownership indicia are held shall be as protection for a security interest.

"Security interest" means an interest in a vessel or facility created or established for the purpose of securing a loan or other obligation. Security interests include, but are not limited to, mortgages, deeds of trusts, liens, and *title pursuant to lease financing transactions. Security interests may also arise from transactions such as sale and leasebacks,* conditional sales, installment sales [etc.], if the transaction creates or establishes an interest in a vessel or facility for the purpose of securing a loan or other obligation.

N.J.S.A. 58:10–23.11g4 (emphasis added).

There are no published opinions from New Jersey courts addressing the Spill Act's security interest exemption. However, the similarity between the language of the Spill Act's exemption and that contained in CERCLA, as well as the similarity in the purposes of the statutory schemes, indicates the two exemptions should be interpreted consistently. *See Northcross,* 412 U.S. at 428, 93 S.Ct. at 2202. Moreover, the statutory definitions contained in the Spill Act's exemption are substantially similar to the prevailing interpretations of CERCLA's exemption. *Compare* N.J.S.A. § 58:10–23.11g4 *with Waterville Industries,* 984 F.2d at 552 (applying CERCLA exemption to sale-leaseback) *and* H.R.Rep. No. 1016, 96th Cong.2d Sess., P.L. 96–510, *reprinted in* 1980 U.S.Code Cong. & Admin.News 6181 (stating secondary ownership benefits will not void exemption if ownership is held primarily to secure a debt).

As indicated with respect to CERCLA's exemption, Prudential held title to Lot 13 and the USR Building primarily to protect the security interest in this property created by the USR Leaseback. *See supra* at 390–394. The existence of secondary benefits of ownership, such as tax depreciation on the property, does not controvert this conclusion. *See* N.J.S.A. § 58:10–23.11g4. Prudential, accordingly, has established the first element of the security interest exemption to the Spill Act. *See* N.J.S.A. § 58:10–23.11g5.

As indicated, in order to benefit from the Spill Act's exemption, Prudential must also establish it did not "participate in the management" of Lot 13 or the USR Building. *Id.* Under the Spill Act:

"Active participation in management" or "participation in management" means *actual* participation in the management or operational affairs by the holder of the security interest and *shall not include the mere capacity, or ability to influence, or the unexercised right to control* vessel or facility operations.

N.J.S.A. § 58:10–23.11g4 (emphasis added). The Spill Act further provides: "Actions that are consistent with holding ownership indicia primarily to protect a security interest do not constitute participation in management...." *Id.*

These definitions are substantially similar to the contours of 'participation in management' under CERCLA. *Compare id. with Bergsoe Metal Corp.,* 910 F.2d at 672 (actual management required to void exemption; reservation of rights consistent with protection of security interest will not void exemption) *and Mirabile,* 1985 WL 97 at *4 (mere financial ability to control practices will not constitute participation in management). As indicated in applying CERCLA's exemption, Prudential did not participate in any respect in the management or operations of Lot 13 or the USR Building. *See supra* at 394–396. Prudential, in fact, had no involvement in the property beyond the conventional involvement of a secured lender. *Id.* Prudential did not, therefore, participate in the management of Lot 13 or the USR Building for the purposes of the security interest exemption to the Spill Act. *See* N.J.S.A. § 58:10–23.11g4.

Prudential held title to Lot 13 and the USR Building primarily to protect a security interest and did not participate in the management of the property. Prudential is, therefore, exempted from liability under the Spill Act by the statute's security interest exemption. *See* N.J.S.A. § 58:10–23.11g5. Accordingly, judgment will be entered in Prudential's favor on Count II of the Second Amended Complaint.

*Conclusion*

For the reasons stated, Prudential is exempt from liability under CERCLA and the Spill Act by virtue of the security interest exemptions contained in those statutes. Judgment is, therefore, entered in favor of Prudential on Counts I and II of the Second Amended Complaint.